**REDACTED**

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

TIFFIN MOTOR HOMES, INC. and SLTNTRST
LLC, Trustee for Fleetwood Liquidating Trust,
Individually and On Behalf of All Others Similarly
Situated,

Plaintiffs,

v.

ALPS ELECTRIC CO., LTD., ALPS ELECTRIC
(NORTH AMERICA), INC., and ALPS
AUTOMOTIVE INC.

Defendants.

Case No.  17-cv-11109

## CLASS ACTION COMPLAINT

Plaintiffs Tiffin Motor Homes, Inc. and SLTNTRST LLC, Trustee for Fleetwood Liquidating Trust, individually and on behalf of the proposed class of direct purchasers of Heater Control Panels (as defined below), bring this action against Defendants for damages under the antitrust laws of the United States.

## SUMMARY OF THE CASE

1.      Defendants are manufacturers of automotive heater control panels ("HCPs") for installation in motor vehicles manufactured or sold in the United States.  Plaintiffs allege that Defendants conspired to rig bids, and to fix, maintain, and/or stabilize the prices of HCPs sold in the United States from at least as early as January 1, 2000 until at least February 28, 2010.

REDACTED

Plaintiffs further allege that Defendants fraudulently concealed their conspiracy.

2.      Plaintiffs bring this lawsuit as a class action on behalf of direct purchasers who, during the Class Period, purchased HCPs in the United States from one or more of the Defendants or their Co-Conspirators.   This action is brought under Section 1 of the Sherman Act to enjoin Defendants' anticompetitive conduct and recover damages suffered by the Class.

3.      As a result of Defendants' unlawful conduct, Plaintiffs and members of the proposed Class paid higher prices for HCPs than they would have paid in a competitive market.

## JURISDICTION AND VENUE

4.      Plaintiffs bring this action to recover damages, including treble damages, and costs of suit and reasonable attorneys' fees, resulting from Defendants' violation of the Sherman Act, 15 U.S.C. § 1.

5.      The Court has jurisdiction over the subject matter of this action pursuant to Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.  Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) and (d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, affected interstate trade and commerce (discussed below) has been carried out in this District, and because one or more of the Defendants reside in this District.

6.      By virtue of their nationwide contacts and activities, Defendants are subject to the jurisdiction of this Court.   Alternatively, there is jurisdiction over the foreign Defendants pursuant to Federal Rule of Civil Procedure 4(k)(2).

REDACTED

## DEFINITIONS

7.      The term "Class Period" refers to the time period from at least as early as January 1, 2000 until at least February 28, 2010.

8.      The term "HCPs" refers to heater control panels, which are also known as climate control panels.

9.      The term "Defendant" or "Defendants" refers to the named Defendants and all of the named Defendants' predecessors, including HCP manufacturers merged with or acquired by the named Defendants and each named Defendants' wholly-owned or controlled subsidiaries or affiliates that sold HCPs directly to purchasers in the United States or to purchasers for use in the United States during the Class Period.

10.      References made herein to any corporation include any predecessors, successors, parents, subsidiaries, affiliates and divisions of that corporation.

## TRADE AND COMMERCE

11.      During the Class Period, each Defendant sold HCPs in the United States in a continuous and uninterrupted flow of interstate commerce.

12.      The business activities of the Defendants substantially affected interstate trade and commerce in the United States.

## PARTIES

13.      Plaintiff Tiffin Motor Homes, Inc., is an Alabama corporation with its principal place of business located in Red Bay, Alabama. Tiffin Motor Homes, Inc. purchased HCPs directly from one or more Defendants and/or their Co-Conspirators during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

14.      Plaintiff SLTNTRST LLC, is the duly authorized and empowered Trustee for

REDACTED

Fleetwood Liquidating Trust. Fleetwood Liquidating Trust was formed pursuant to the Joint Plan of Liquidation of Fleetwood Enterprises, Inc. and Its Affiliated Debtor and the Official Committee Creditors Holding Unsecured Claims. The Joint Plan of Liquidation was confirmed by the United States Bankruptcy Court for the Central District of California (Riverside) pursuant to 11 U.S.C. § 1129. Fleetwood Enterprises, Inc. filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Bankruptcy Code on March 10, 2009. Fleetwood Enterprises, Inc., headquartered in California, was a leading producer of recreational vehicles, motor homes, and travel trailers in the United States. Fleetwood Enterprises, Inc. purchased HCPs directly from one or more Defendants and/or their Co-Conspirators during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

*Alps Defendants*

25.     Defendant Alps Electric Co., Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan. Defendant Alps Electric Co., Ltd., directly and/or through its subsidiaries, which it wholly owned and/or controlled, manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period.

26.     Defendant Alps Electric (North America), Inc. is a California corporation with its principal place of business in Campbell, California. It is a subsidiary of and wholly owned and/or controlled by its parent, Alps Electric Co., Ltd. Defendant Alps Electric (North America), Inc. manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period. Alps Electric (North America), Inc. submitted responses to RFQs in the U.S., on behalf of itself and its parent. At all times during

4

REDACTED

the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

27.     Defendant Alps Automotive Inc. is a Michigan corporation with its principal place of business in Auburn Hills, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Alps Electric Co., Ltd., which exerted influence and/or control over its practices, policies sales, and finances, in the United States, during the Class Period. Defendant Alps Automotive Inc. manufactured, marketed and/or sold HCPs that were purchased throughout the United States, including in this district, during the Class Period, including by firms that sold such Heater Control Panels to Plaintiffs.  At all times during the Class Period, its activities in the United States were under the control and direction of its Japanese parent.

28.     Executives who have worked for Alps Electric Co., Ltd. in Japan have also worked for Alps Electric North America, Inc. and Alps Automotive, Inc., in the U.S.  For instance, Yasuhiro Fujii, an Executive Director of Alps Electric Co. Ltd., has previously served as Chairman in Alps Electric North America, Inc. and Alps Automotive, Inc.  Also, Masataka Kataoka, the Chairman of Alps Electric Co., Ltd. is the President of Alps Automotive, Inc.

29.     Alps Electric Co., Ltd., Alps Electric (North America), Inc., and Alps Automotive Inc. are all accessible from one website (http://www.alps.com).  The two U.S. Alps entities are referred to on the website as "ALPS Location[s]."

30.     Alps files one yearly financial report, governed only by Japanese accounting principles, on behalf of all Alps entities, including its U.S. subsidiaries, referring to that report as the "[c]onsolidated financial statements for the Alps Group (the Company and its consolidated subsidiaries)."  "[T]he Company" refers to Alps Electric Co., Ltd.

31.     Alps' financial report does not distinguish between its subsidiaries in different

REDACTED

countries that manufacture automotive electronics, but generally refers to the "Auto (Automotive) Division" of its Electronic Components segment, and reports sales and assets for that segment in the aggregate, rather than broken down by the subsidiaries that comprise it.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

### *Denso*

32. Denso Corporation, is a Japanese corporation with its principal place of business located in Kariya, Japan. Denso Corporation – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold HCPs that were purchased in the United States, including in this District, during the Class Period.

33. Denso International America, Inc., is a Delaware corporation with its principal place of business in Southfield, Michigan. It is a subsidiary of, and wholly-owned or controlled by, its parent, Denso Corporation. Denso International America, Inc., manufactured, marketed, or sold HCPs that were purchased in the United States, including in this District, during the Class Period. During the Class Period, its activities in the United States were under the control and direction of Denso Corporation.

34. Denso Corporation and Denso International America, Inc. are referred to collectively herein as "Denso."

### *Sumitomo*

35. Sumitomo Electric Industries, Ltd., is a Japanese corporation with its principal place of business in Osaka, Japan. Sumitomo Electric Industries, Ltd. – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold HCPs that were purchased in the United States, including in this District, during the Class Period.

36. Sumitomo Wiring Systems, Ltd., is a Japanese corporation with its principal place

6

**REDACTED**

of business in Yokkaichi, Japan.  Sumitomo Wiring Systems, Ltd. – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold HCPs that were purchased in the United States, including in this District, during the Class Period.

37.     Sumitomo Electric Wiring Systems, Inc. ("SEWS"), is a Delaware corporation with its principal place of business in Bowling Green, Kentucky.  It is a joint venture between Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd. SEWS manufactured, marketed, or sold HCPs that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Sumitomo Electric Industries, Ltd. and Sumitomo Wiring Systems, Ltd.

38.     Sumitomo Electric Industries, Ltd., Sumitomo Wiring Systems, Ltd., and SEWS are referred to collectively herein as "Sumitomo."

*Tokai Rika*

39.     Tokai Rika Co., Ltd., is a Japanese corporation with its principal place of business in Nagoya, Japan.  Tokai Rika Co., Ltd. – directly or through its subsidiaries, which it wholly-owned or controlled – manufactured, marketed, or sold HCPs that were purchased in the United States, including in this District, during the Class Period.

40.     TRAM, Inc. ("TRAM"), is a Michigan corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly-owned or controlled by its parent, Tokai Rika Co., Ltd.  TRAM manufactured, marketed, or sold HCPs that were purchased in the United States, including in this District, during the Class Period.  During the Class Period, its activities in the United States were under the control and direction of Tokai Rika Co., Ltd.

41.     Tokai Rika Co., Ltd. And TRAM are referred to collectively herein as "Tokai

7

REDACTED

Rika."

42.     The acts alleged in this Complaint to have been done by Denso International America, Inc., Sumitomo Wiring Systems, Ltd., SEWS, and TRAM, Alps Electric (North America), Inc., and Alps Automotive Inc., were authorized, ordered, and condoned by their parent companies and the acts alleged to have been done by the Denso, Sumitomo, and Tokai Rika and the ALPs Defendants were authorized, ordered, and performed by their officers, directors, agents, employees, or representatives while engaged in the management, direction, control, or transaction of their business affairs.

43.     Denso, Sumitomo, and Tokai Rika (collectively "Co-Conspirators") have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their Co-Conspirators whether named or not named as Defendants in this Complaint.

43.     Each Defendant and their Co-Conspirators acted as the agent or joint venturer of or for the other Defendants and their Co-Conspirators with respect to the acts, violations, and common course of conduct alleged herein.

## CLASS ACTION ALLEGATIONS

44.     Plaintiffs bring this action on behalf of themselves and all others similarly situated (the "Class") pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).  The Class is defined as follows:

> "All individuals and entities (excluding Defendants and their present and former parents, subsidiaries, and affiliates) that purchased Heater Control Panels in the United States directly from one or more Defendants and their Co-Conspirators from January 1, 2000 through the filing date of this Complaint."  For purposes of the class definition, the following entities are "Co-Conspirators": Denso Corporation; Denso International America, Inc.; Sumitomo Electric Industries, Ltd.; Sumitomo Wiring Systems, Ltd.; Sumitomo Electric Wiring Systems, Inc.;

**REDACTED**

Tokai Rika Co., Ltd.; and TRAM, Inc.

45.     Plaintiffs do not know the exact number of Class members as such information is exclusively controlled by Defendants and their Co-Conspirators.  Because of the trade and commerce involved, however, Plaintiffs believe that the Class is so numerous and geographically dispersed throughout the United States that joinder of all Class members is impracticable.

46.     There are questions of law or fact common to the class, including but not limited to the following:

> a.     Whether Defendants and their Co-Conspirators engaged in a contract, combination, or conspiracy to rig bids and to fix, raise, maintain, and/or stabilize prices of HCPs sold in the United States;
>
> b.     Whether Defendants and their Co-Conspirators agreed to allocate among themselves on a model-by-model basis the supply of HCPs they sold to direct purchasers in the United States;
>
> c.     Whether Defendants' and their Co-Conspirators' conduct caused the prices of HCPs sold in the United States to be sold at artificially high levels;
>
> d.     Whether Defendants and their Co-Conspirators undertook actions to conceal their unlawful conspiracy; and
>
> e.     Whether Plaintiffs and other members of the Class were injured by Defendants' and their Co-Conspirators' conduct, and, if so, the appropriate class-wide measure of damages for Class members.

47.     These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

REDACTED

48.     Plaintiffs' claims are typical of the claims of the Class because Plaintiffs directly purchased HCPs from a Defendant or their Co-Conspirators, all Class members were damaged by the same conspiracy alleged herein, and the relief sought by Plaintiffs is common to the Class.

49.     Plaintiffs will fairly and adequately represent the interests of the Class in that Plaintiffs are direct purchasers of HCPs and have no conflict with any other members of the Class.  Further, Plaintiffs have retained competent counsel experienced in antitrust, class action, and other complex litigation.

50.     A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.  Prosecution of this matter as a class action will eliminate the possibility of repetitive litigation and there are no inherent barriers to managing the case as a class action.

51.     The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying outcomes.

52.     The Class is also readily definable and is one for which records likely exist in the files of Defendants and their Co-Conspirators.

## FACTUAL ALLEGATIONS

53.     Located in the center console of a motor vehicle, HCPs are operational panels with buttons and switches that control the climate of the interior environment of the vehicle.

54.     Defendants and their Co-Conspirators manufacture and sell several types of HCPs, including but not limited to, electronic HCPs.

55.     The electronic HCP product category is broken down into manual and automatic HCPs.   Manual HCPs are known as low-grade while automatic HCPs are commonly referred to

10

REDACTED

as high-grade.

56.     As part of the manufacturing process, OEMs install HCPs into new vehicles. HCPs are also installed into vehicles to replace worn out, defective or damaged parts.

57.     HCPs manufactured, distributed, or sold by Defendants and their Co-Conspirators during the Class Period are not functionally distinguishable in any material way.

**The Heater Control Panels Market is Conducive to Collusion**

58.     Several important economic characteristics of the market for HCPs plausibly increased its vulnerability to Defendants' and their Co-Conspirators' price-fixing conspiracy.

59.     One such important, economic characteristic of a market conducive to conspiratorial behavior is high barriers to entry.  There are substantial barriers to entry in the market for HCPs because of significant start-up capital expenditures.  A new entrant into the business would have to incur millions of dollars in costs, including large investments in plant and machinery, research and development, infrastructure for distribution, transportation, and labor.

60.     Additionally, the market for HCPs is highly concentrated.  Upon information and belief, Defendants and their Co-Conspirators control a majority of the market for the manufacture and sale of HCPs for use in motor vehicles manufactured and/or sold in or into the United States.

61.     Inelastic pricing is another important characteristic.  When a seller of goods or services can increase prices without suffering substantial reduction in sales, pricing is considered inelastic.  In order for a cartel to profit from raising prices above competitive levels, pricing must be relativity inelastic.  Otherwise, increased prices would result in declining use of services, revenues, and profits.

62.     Pricing for HCPs is highly inelastic.  Motor vehicle manufacturers must use HCPs

REDACTED

because there are no viable substitute products.

**History of Collusion**

63.     Sumitomo and Denso have histories of collusion, have been involved in antitrust investigations with respect to other automotive parts, and have been fined for their participation in anticompetitive cartels.

64.     For example, Sumitomo's 2011 Annual Report acknowledged that "[t]he Company was investigated by the [Japan Fair Trade Commission ("JFTC")] in February 2010 about its trade in automotive wiring harnesses-related products, and is under investigation by EU, U.S., and other overseas antitrust regulators."

65.     Further, on January 19, 2012, the JFTC fined Sumitomo Electric Industries, Ltd. approximately $27.5 million based on its involvement in a price-fixing and bid-rigging conspiracy in connection with the sale of automotive wire harnesses and related products in violation of Article 3 of the Japanese Antimonopoly Act.  According to a JFTC press release, Sumitomo and its Co-Conspirators "substantially restrained competition . . . [by] appointing the designated successful bidder and managing to have the designated successful bidder win the bidding."

66.     In addition, on January 30, 2012, the U.S. Department of Justice ("DOJ") announced that Denso Corporation agreed to plead guilty (and pay a total of $78 million in criminal fines) to a two-count criminal information charging Denso Corporation with, among other things, participating in a combination and conspiracy with its Co-Conspirators to suppress and eliminate competition by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of certain electronic control units sold to an automobile manufacturer in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010

REDACTED

in violation of Section 1 of the Sherman Act.  On March 5, 2012, Denso Corporation pleaded guilty to this charge.

## DEFENDANTS' PRICE-FIXING CONSPIRACY

67.   During the Class Period, Defendants and their Co-Conspirators conspired to (a) rig bids for and allocate the supply of HCPs and (b) raise, fix, and maintain prices for HCPs sold in or into the United States.

68.   Defendants and their Co-Conspirators engaged in numerous acts in furtherance of the alleged conspiracy, as described below.

69.   Defendants and their Co-Conspirators participated in meetings, conversations, and communications in the United States and abroad to discuss bids and price quotations for HCPs sold in or into the United States.

70.   Defendants and their Co-Conspirators agreed during those meetings, conversations, and communications to rig bids and allocate the supply of HCPs sold in or into the United States.

71.   To account for market conditions and economies of scale, motor vehicle manufacturers commonly requested price adjustments from parts suppliers.  Defendants and their Co-Conspirators agreed during meetings, conversations, and communications to coordinate price adjustments requested by motor vehicle manufacturers in the United States.

72.   Defendants and their Co-Conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers in the United States in accordance with their conspiratorial agreements.

73.   Defendants and their Co-Conspirators held meetings and conversations in the

**REDACTED**

United States and elsewhere to monitor and police their bid-rigging, market allocation, and price-fixing conspiracy.

74.     Defendants and their Co-Conspirators undertook measures to maintain the secretive nature of their unlawful conduct, including but not limited to, using code names and meeting at private residences or remote locations.

75.     Defendants and their Co-Conspirators accomplished their conspiracy, in part, by rigging bids they made in response to Requests for Quotation ("RFQs").  Motor vehicle Original Equipment Manufacturers ("OEMs") require multiple sources for motor vehicle parts.  As part of their supply chain and procurement process, OEMs issue RFQs to motor vehicle parts suppliers on a model-by-model basis.

76.     OEMs use RFQs to procure parts for U.S.-manufactured motor vehicles in the United States and abroad.

77.     Typically, OEMs issue RFQs for motor vehicle parts, such as HCPs, approximately three years before the OEM begins vehicle production.

78.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (1) the OEM issues the RFQ to multiple parts suppliers, (2) the suppliers submit bids, (3) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing, (4) the suppliers submit revised bids, and (5) the OEM selects the winner.

79.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

80.     When OEMs purchase, for example, HCPs directly from the supplier to whom it awarded the contract, the OEMs purchase the HCPs at the winning price.

REDACTED

81.     That winning price is also used when suppliers that were not part of the RFQ process purchase HCPs directly from the winning HCP bidder for incorporation into products manufactured and sold to vehicle manufacturers.   Those suppliers, who directly purchase HCPs from the winning bidder, pay the winning bidder at least the winning price.

**Summary of Specific Unlawful Meetings and Agreements**

82.     Defendants' and their Co-Conspirators conduct persisted for over ten years (2000 to 2010).  Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that Defendants' and their Co-Conspirators' conspiracy would have continued undetected.

83.     Defendants and their Co-Conspirators manipulated the RFQ process to accomplish their conspiracy.

84.     As part of their conspiracy, Defendants and their Co-Conspirators at times agreed to submit bids that would allow the supplier who had the existing HCP business for a particular model to win the HCP business for the successor model.

85.     Further, Defendants and their Co-Conspirators coordinated their HCP pricing. Defendants and their Co-Conspirators submitted bids (responses to RFQs) that incorporated changes to pricing based on the conspiratorial agreements they made with each other. Defendants and their Co-Conspirators exchanged pricing information not just to insure that the agreed-upon party would be the low bidder and win the business, but also to insure that the losing bidders would appear competitive in order to preserve the opportunity to bid for future business.

86.     During the Class Period, Defendants and their Co-Conspirators communicated, held meetings, and reached conspiratorial agreements in the United States and in Japan in

**REDACTED**

furtherance of their price-fixing conspiracy.  Defendants' and their co- conspirator's activities included, but were not limited to, the following:

> a.  Agreeing to unlawfully coordinate pricing for HCPs and allocate sales of HCPs.  For example, in responding to RFQs, Defendants and their Co-Conspirators agreed that the incumbent supplier would be the lower bidder and to bid accordingly;
>
> b.  Colluding both in the United States and in Japan with regard to RFQs for HCP business by agreeing on pricing in Japan and then communicating agreed upon prices to Defendants' and their co- conspirator's subsidiaries in the United States, where the prices were converted to dollars and submitted collusively;
>
> c.  Conspiring in the United States and reaching anticompetitive agreements whereby Defendants and their Co-Conspirators agreed to withdraw from bidding on HCP RFQs; and
>
> d.  Discussing and exchanging price information with regard to HCP RFQs and reaching conspiratorial agreements with respect to RFQs by means of conversations conducted in the United States and Japan on multiple occasions to coordinate responses, exchanges, and adjustments of HCPs pricing before submission to OEMs.

87.  Defendants and their Co-Conspirators knew and intended that their actions regarding the sale of HCPs to motor vehicle manufacturers would have a direct impact on prices for HCPs sold to all direct purchasers of HCPs throughout the United States.

88.  Defendants and their Co-Conspirators engaged in a single price-fixing conspiracy

**REDACTED**

involving HCPs that impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of HCPs. Defendants' and their co- conspirator's scheme was implemented, succeeded, and affected the prices for all HCPs.



**REDACTED**



**Government Investigations and Guilty Pleas**

98.     Various U.S. and international governmental authorities, including the DOJ via its Antitrust Division, are currently investigating anticompetitive conduct in connection with the production and sale of HCPs and numerous other motor vehicle components.

99.     This international investigation began in Europe after one vehicle manufacturer failed to attract competitive bids for wire harness systems.  The vehicle manufacturer then joined with other manufacturers and took their complaint to the European Commission.

100.    On February 23, 2010, the Federal Bureau of Investigation's ("FBI") Detroit division and the DOJ raided the U.S. offices of Denso, TRAM, and Yazaki North America, Inc. DOJ spokeswoman Gina Talamona said that "[t]he antitrust division is investigating the possibility of anticompetitive cartel conduct. . . . We are coordinating with the European Commission and other foreign competition authorities."

REDACTED

101.    On February 24, 2010, it was reported that the JFTC raided three Japanese auto parts manufacturers suspected of participating in a price-fixing cartel: Sumitomo Electric Industries, Ltd., Yazaki Corporation, and Furukawa Electric Co., Ltd.

102.    On July 20, 2011, the JFTC raided seven Japanese auto parts makers including Denso Corporation.  The *Japan Times* reported that the JFTC "suspects the parts manufacturers had meetings from 2002 or earlier to set parts prices and decided which companies would win contracts before bidding for orders from automakers."

103.    On January 30, 2012, the DOJ charged Denso Corporation with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs" in violation of the Sherman Act.

104.    Also on January 30, 2012, the DOJ announced that Denso Corporation agreed to plead guilty and pay a total of $78 million in criminal fines to a two-count criminal information charging Denso Corporation with, among other things, participating in a combination and conspiracy with its Co-Conspirators to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs in violation of the Sherman Act.  On March 5, 2012, Denso Corporation pleaded guilty to this charge.

105.    In a January 30, 2012 DOJ press release, Sharis A. Pozen, who was the Acting Assistant Attorney General of the DOJ's Antitrust Division, stated that the auto parts antitrust investigation is "the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct."

**REDACTED**

106.    FBI Special Agent in Charge Andrew G. Arena also said that "[t]his criminal activity has a significant impact on automotive manufacturers in the United States, Canada, Japan and Europe and had been occurring at least a decade.  The conduct had also affected commerce on a global scale in almost every market where automobiles are manufactured and/or sold."

107.    On January 31, 2012, Denso Corporation issued a news release stating that "to emphasize the seriousness of these matters, Denso Corporation's chairman, president and certain board members and executive directors will voluntarily return 30 percent to 10 percent [sic] of their compensation for a three-month period starting in February 2012."   According to a company spokeswoman, eight Denso executives were ordered to take pay cuts.

108.    Denso and its co-conspirators manufactured motor vehicle HCPs (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

109.    Denso and its co-conspirators (a) had meetings and communications in the United States and Japan to discuss bids and price quotations to be submitted to auto manufacturers in the United States, (b) agreed on bids and price quotations to be submitted  to auto manufacturers in the United States, (c) agreed to allocate the supply of HCPs sold in the United States on a model-by-model basis, (d) agreed to coordinate price adjustments requested by automobile manufacturers in the United States, (e) submitted bids, price quotations, and price adjustments to automobile manufacturers in the United States in accordance with the agreements reached, (f) sold HCPs to an automobile manufacturer in the United States at collusive and noncompetitive

**REDACTED**

prices, and (g) participated in meetings and communications to monitor the conspiracy and conceal their unlawful conduct, including but not limited to, using code names and meeting at private residences or remote locations.

110.    On May 16, 2012, Denso's Norihiro Imai pleaded guilty to a conspiracy to restrain trade in the market for HCPs in violation of the Sherman Act before Judge George Steeh of the U.S. District Court for the Eastern District of Michigan.  Imai was employed by Denso as a sales representative in the Toyota Sales Division from August 2006 until January 2008, and as Assistant Manager of the Toyota Sales Division from January 2008 until at least June 2009.  As part of his guilty plea, Imai admitted that during meetings and conversations with co-conspirators, "agreements were reached to allocate the supply of HCPs sold to an automobile manufacturer on a model-by-model basis, rig bids quoted to an automobile manufacturer for HCPs, and to fix, stabilize, and maintain the prices" for HCPs sold in the United States.

111.    On June 27, 2012, Denso's Makoto Hattori pleaded guilty to a conspiracy to restrain trade in the market for HCPs in violation of the Sherman Act before Judge George Steeh of the U.S. District Court for the Eastern District of Michigan.  Hattori was employed by Denso as Assistant Manager in the Toyota Sales Division from July 2005 until December 2006, and as Manager of the Toyota Sales Division from December 2006 until at least July 2008.  As part of his guilty plea, Hattori admitted that during meetings and conversations with co-conspirators, "agreements were reached to allocate the supply of HCPs sold to an automobile manufacturer on a model-by-model basis, rig bids quoted to an automobile manufacturer for HCPs, and to fix, stabilize, and maintain the prices" for HCPs sold in the United States.

112.    On October 30, 2012, the DOJ charged Tokai Rika Co., Ltd. with participating in a "combination and conspiracy to suppress and eliminate competition in the automotive parts

**REDACTED**

industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs" in violation of the Sherman Act.

113.    Additionally, the DOJ also charged Tokai Rika Co, Ltd. with obstruction of justice after an executive of Tokai Rika, acting on the company's behalf, "directed employees to delete electronic data and destroy paper documents likely to contain evidence of antitrust crimes in the United States and elsewhere" in violation of 18 U.S.C. § 1512(b)(2)(B).  According to a *Crain's Detroit Business* article, after learning that the FBI executed a search warrant on its United States subsidiary, TRAM, a Tokai Rika executive "directed employees of its U.S. subsidiary to destroy and alter records that were to be furnished to a federal grand jury" sitting in the Eastern District of Michigan.  The criminal information further noted that "some of the deleted electronic data and destroyed paper documents were non-recoverable."

114.    Also on October 30, 2012, the DOJ announced that Tokai Rika Co., Ltd. agreed to pay a $17.7 million criminal fine and plead guilty to a two-count criminal information charging Tokai Rika with (a) participating in a combination and conspiracy with its co-conspirators to suppress and eliminate competition in automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, HCPs in violation of the Sherman Act and (b) obstruction of justice in violation of 18 U.S.C. § 1512(b)(2)(B).  On December 12, 2012, Tokai Rika pleaded guilty to these charges.

115.    In an October 30, 2012 DOJ press release, Scott D. Hammond, Deputy Assistant Attorney General of the Antitrust Division's criminal enforcement program, stated that Tokai Rika "knew their actions would harm American consumers, and attempted to cover it up when caught.   The division will continue to hold accountable companies who engage in anticompetitive conduct and who obstruct law enforcement."

116.    On October 31, 2012, Tokai Rika Co., Ltd. issued a news release stating that "to

REDACTED

emphasize the seriousness of these matters, Tokai Rika's Chairman of the Board, President and other board members and corporate officers will voluntarily return 10 percent of their compensation for a from three to one-month [sic] period starting in November 2012."

117.    Tokai Rika and its co-conspirators manufactured motor vehicle HCPs (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) in Japan for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in the United States.

118.    Tokai Rika and its co-conspirators (a) had meetings and communications in the United States and Japan to discuss bids and price quotations to be submitted to an automobile manufacturer in the United States, (b) agreed on bids and price quotations to be submitted  to an automobile manufacturer in the United States, (c) agreed to allocate the supply of HCPs sold to an automobile manufacturer in the United States on a model-by-model basis, (d) agreed to coordinate price adjustments requested by an automobile manufacturer in the United States, (e) submitted bids, price quotations, and price adjustments to an automobile manufacturer in the United States in accordance with the agreements reached, (f) sold HCPs to an automobile manufacturer in the United States at collusive and noncompetitive prices, and (g) participated in meetings and communications to monitor the conspiracy and conceal their unlawful conduct, including but not limited to, using code names and selecting meeting locations and times to avoid detection.

## PLAINTIFFS' CLAIMS ARE TIMELY

119.    Plaintiffs incorporate by reference the allegations set forth above and adopt same as though fully set forth herein.

**REDACTED**

120.    Plaintiffs and the members of the Class had no knowledge of the anticompetitive conduct alleged herein, or of facts sufficient to place them on notice of the claims set forth herein, until at least February 2010, at the earliest, the date that raids of Co-Conspirators were conducted.   As a result, Plaintiffs and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until, at the earliest, February 2010.

121.    No information in the public domain was available to Plaintiffs and the members of the Class prior to February 2010, when the DOJ executed warrants and searched the offices of three Japanese motor vehicle part makers in metropolitan Detroit.  Prior to that time, there was insufficient information to suggest that any one of the Defendants and their Co-Conspirators were involved in a conspiracy to price-fix and rig bids for HCPs.  For these reasons, the statute of limitations as to claims alleged herein did not begin to run until, at the earliest, February 2010.

122.    Further, fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Class until at least February 2010.  Defendants and their Co-Conspirators affirmatively and wrongfully concealed their anticompetitive conduct from Plaintiffs and the Class, from at least as early as January 2000 through at least February 2010. During that time, Plaintiffs and the Class did not learn or discover the operative facts giving rise to the instant Complaint.

123.    Before at least February 2010, Plaintiffs and members of the Class were unaware of Defendants' and their Co-Conspirators' unlawful conduct, and did not know before then that that they were paying supra- competitive prices for HCPs throughout the United States during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and the members of the Class that would have suggested to Plaintiffs that they were being

**REDACTED**

injured by Defendants' and their Co-Conspirators' unlawful conduct.

124.    The affirmative acts of the Defendants and their Co-Conspirators alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

125.    By its very nature, Defendants' and their Co-Conspirators' anticompetitive conspiracy was inherently self- concealing.  HCPs are not exempt from antitrust regulation and, thus, Plaintiffs and the members of the Class reasonably considered it to be a competitive industry.  Defendants and their Co-Conspirators met and communicated in secret and agreed to keep the facts about their collusive conduct from being discovered by any member of the public or by the OEMs and other direct purchasers with whom they did business.

126.    Defendants and their Co-Conspirators represented publicly, both to customers and otherwise, that their pricing and bidding activities were unilateral, rather than based on anticompetitive agreements. In making those false representations, Defendants and their Co-Conspirators misled Plaintiffs and members of the Class as to the true, collusive, and coordinated nature of their bid-rigging, customer allocation, and price- fixing activities.

127.    Defendants' and their Co-Conspirators' wrongful conduct was carried out in part through means and methods that were designed to avoid detection, and which, in fact, successfully precluded detection.

128.    In particular, Defendants and their Co-Conspirators participated in secret meetings, conversations, and communications to discuss the bids and price quotations to be submitted to customers in the United States and elsewhere.

129.    During these meetings, conversations, and communications, Defendants and their Co-Conspirators agreed upon bids and price quotations to be submitted to customers in the

**REDACTED**

United States and elsewhere.

130.    Defendants and their Co-Conspirators likewise agreed to allocate the supply of HCPs sold to customers in the United States and elsewhere on a model-by-model basis.

131.    Defendants and their Co-Conspirators also agreed to coordinate price adjustments requested by customers in the United States and elsewhere.

132.    In accordance with the agreements reached by Defendants and their Co-Conspirators, they submitted collusive bids, price quotations, and price adjustments to customers in the United States and elsewhere.

133.    For example, the DOJ charged Denso Corporation with, among other unlawful acts, "employing measures to keep their conduct secret, including but not limited to using code names and meeting at private residences or remote locations."  The DOJ also charged Tokai Rika with "employing measures to keep [its] conduct secret, including using code names and choosing meeting places to avoid detection" as well as "direct[ing] employees to delete electronic data and destroy paper documents likely to contain evidence of antitrust crimes in the United States and elsewhere."   These corporate Co-Conspirators have since pleaded guilty to charges levied against them by the DOJ.

134.    In addition, the DOJ charged Norihiro Imai and Makoto Hattori, individual corporate officers of Denso Corporation, with using code names and engaging in secret, conspiratorial meetings to hide Defendants' conspiracy with regards to HCPs from the public and competition authorities.   Mr. Imai and Mr. Hattori have since pleaded guilty to charges levied against them by the DOJ.   Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the lawfulness of Defendants' and their Co-Conspirators' HCPs prices.

**REDACTED**

135.    Plaintiffs and the members of the Class could not have discovered the alleged combination or conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their Co-Conspirators to avoid detection of, and fraudulently conceal, their conduct.

136.    Plaintiffs received various pricing information from one or more of Defendants or their Co-Conspirators.  Plaintiffs had no way to know that these prices were higher than they should have been due to the conspiracy alleged herein.

137.    For these reasons, the statute of limitations applicable to Plaintiffs' and the Class's claims was tolled and did not begin to run until at least February 2010.

## ANTITRUST INJURY

138.    Defendants' and their co- conspirator's conspiracy caused injury to Plaintiffs and members of the Class by suppressing price competition among HCPs manufacturers, thereby depriving all direct purchasers of HCPs of the benefits of a competitive market and setting prices of HCPs at artificially high levels.

139.    As a direct result of Defendants' and their co-conspirator's conspiracy, Plaintiffs and members of the Class have been injured in their business or property in that they paid more for HCPs than otherwise would have been the case in a competitive market.

## CLAIM FOR RELIEF

### (Sherman Act Section 1 – Against All Defendants)

140.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

141.    During the Class Period, Defendants and their Co-Conspirators entered into a continuing agreement, combination, or conspiracy in restraint of trade to artificially raise, fix,

**REDACTED**

maintain, or stabilize prices for HCPs sold in or into the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

142.    The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

143.    The contract, combination or conspiracy resulted in an agreement, understanding, or concerted action between and among the Defendants and their Co-Conspirators in furtherance of which the Defendants and their Co-Conspirators fixed, raised, maintained, or stabilized prices for HCPs sold in or into the United States.  Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws.

144.    Defendants and their Co-Conspirators succeeded in rigging bids and fixing, raising, maintaining, and stabilizing the prices of HCPs sold in or into the United States during the Class Period.

145.    The conspiracy among Defendants and their Co-Conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their Co-Conspirators.

146.    For purposes of formulating and effectuating their conspiracy, Defendants and their Co-Conspirators did those things they contracted, combined, or conspired to do, including:

> a.    Participating in meetings and conversations in the United States and Japan to discuss the bids and price quotations of HCPs to be submitted to direct purchasers in the United States;
>
> b.    Agreeing on bids and price quotations to be submitted to direct purchasers in the United States;

**REDACTED**

    c.     Agreeing to manipulate prices and allocate supply of HCPs sold in or into the United States in a manner that deprived direct purchasers of free and open competition;

    d.     Agreeing to coordinate price adjustments in the United States;

    e.     Submitting bids, price quotations, and price adjustments to direct purchasers of HCPs in accordance with the agreements reached;

    f.     Selling HCPs to direct purchasers in the United States at supra competitive prices; and g.  Employing measures to conceal the true nature of their unlawful conduct from Plaintiffs and other members of the Class in furtherance of the conspiracy.

147.   As a direct and proximate result of Defendants' and their Co-Conspirators' unlawful conduct, Plaintiffs and the other members of the Class have been injured in their businesses and property in that they have paid more for HCPs than they otherwise would have paid in a competitive market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf and on behalf of the Class herein, and respectfully request the following relief:

A.    That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.    That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their Co-Conspirators as alleged in this complaint, be adjudicated

29

**REDACTED**

and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1;

    C.     That Plaintiffs and members of the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. §15(a);

    D.     That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents and employees thereof and all other persons acting or claiming to act on their behalf be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

    E.     That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

    F.     That Plaintiffs and members of the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

    G.     That Plaintiffs and members of the Class receive such other or further relief as may be just and proper.

REDACTED

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

DATED: April 7, 2017              Respectfully submitted,

                 /s/David H. Fink

                 David H. Fink (P28235)
                 Darryl Bressack (P67820)
                 Nathan J. Fink (P75185)
                 FINK + ASSOCIATES LAW
                 38500 Woodward Ave; Suite 350
                 Bloomfield Hills, MI 48304
                 (248) 971-2500

                 *Interim Liaison Counsel for the Direct Purchaser Plaintiffs*

| | |
|---|---|
| Steven A. Kanner | Joseph C. Kohn |
| William H. London | William E. Hoese |
| Michael E. Moskovitz | Douglas A. Abrahams |
| FREED KANNER LONDON | KOHN, SWIFT & GRAF, P.C. |
|   & MILLEN LLC | One South Broad Street, Suite 2100 |
| 2201 Waukegan Road, Suite 130 | Philadelphia, PA 19107 |
| Bannockburn, IL 60015 | Telephone: (215) 238-1700 |
| Telephone: (224) 632-4500 | |
| | |
| Gregory P. Hansel | Eugene A. Spector |
| Randall B. Weill | William G. Caldes |
| Michael S. Smith | Jonathan M. Jagher |
| PRETI, FLAHERTY, BELIVEAU | Jeffrey L. Spector |
|   & PACHIOS LLP | SPECTOR ROSEMAN KODROFF |
| One City Center, P.O. Box 9546 |   & WILLIS, P.C. |
| Portland, ME 04112-9546 | 1818 Market Street, Suite 2500 |
| Telephone: (207) 791-3000 | Philadelphia, PA 19103 |
| | Telephone: (215) 496-0300 |

*Interim Lead Counsel for the Direct Purchaser Plaintiffs*

31

**REDACTED**

Brian Murray
Lee Albert
Gregory Linkh
**GLANCY BINKOW & GOLDBERG LLP**
77 Water Street, 7th Floor
New York, NY 10015
Telephone: (646) 722-4180
bmurray@glancylaw.com
lalbert@glancylaw.com
glinkh@glancylaw.com

Melissa H. Maxman
**COHEN & GRESSER LLP**
1707 L Street, NW Suite
550
Washington, DC 20036
Telephone: 202 851 2070
MMaxman@CohenGresser.com

M. John Dominguez
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
2925 PGA Boulevard, Suite 204
Palm Beach Gardens, FL 33410
Telephone: (561) 833-6575
jdominguez@cohenmilstein.com

Brent W. Johnson
**COHEN MILSTEIN SELLERS
& TOLL PLLC**
1100 New York Ave. NW, Suite 500 West
Washington, D.C. 20005
Telephone: (202) 408-4600
bjohnson@cohenmilstein.com

*Counsel for Plaintiffs Tiffin Motor Homes, Inc.,
SLTNTRST LLC, Trustee for Fleetwood Liquidating
Trust, and the Proposed Class*